(No. 20977.

JOSEPHINE HEITZIG *et al.* Defendants in Error, *vs.* JOSEPH-
INE C. GOETTEN, Plaintiff in Error.

*Opinion filed February 19, 1932—Rehearing denied April 8, 1932.*

F. A. WHITESIDE, (HUGH J. DOBBS, and J. R. FINKLE, of counsel,) for plaintiff in error.

SUMNER & REARDON, for defendants in error.

Mr. JUSTICE ORR delivered the opinion of the court:

This case is here on writ of error from a decree of the circuit court of Jersey county against Josephine C. Goetten and others which construed the will of Casper Goetten, deceased, and directed a sale of real estate upon failure of the defendant Josephine C. Goetten to pay certain sums of money found by such decree to be due as legacies. The decree granted relief to the complainants under their original bill of complaint and dismissed the defendants' cross-bill for want of equity. Josephine C. Goetten prosecutes this writ of error.

The facts admitted by the pleadings and disclosed by the evidence are as follows: Casper Goetten died testate September 27, 1877, the owner of $2475 worth of personal property and 210 acres of unincumbered farm land. Surviving him were: Christina, his widow; five daughters, Helena (Lena), Josephine, Mary, Mina (Minnie) and Christina; and one son, Frederick. Daughter Christina died unmarried and intestate in 1896. Son Frederick died testate in 1910. Surviving Frederick were the defendants and cross-complainants, Josephine C. Goetten, his widow,

and four daughters. By his last will, Frederick, after payment of debts, gave all of his property to his widow, Josephine. Casper's widow, Christina, died testate April 28, 1927. All of Casper's children, except Frederick and Christina, were living at their mother's death. By her will Casper's widow gave $10 each to her married daughter Lena, her daughter-in-law, Josephine Goetten, and her four grand-daughters, and devised the rest of her estate in equal shares to her married daughters, Josephine, Minnie and Mary, the complainants. Two years after the death of Casper's widow, the complainants filed their bill to enforce payment of the sums claimed to be due them under Casper's will, in their own right and as heirs of their sister Christina and as beneficiaries under their mother's will. Casper's will provided, after directing payment of his debts, as follows:

"Second—I give, devise and bequeath unto my beloved wife, Christina Goetten, all and singular my estate of every nature whatsoever of which I may die seized or possessed to hold, use and occupy the same during the term of her natural life, and I direct that the farm place shall be worked by my son, Frederick, under the direction of my said wife as long as he agrees with her but in the event of disagreement then my said wife shall cause it to be worked and conducted by whomsoever she pleases for her own benefit; but in case that any of my daughters, Helena, Josephine, Mary, Mina, and Christina, shall remain unmarried, she or they shall be allowed to live at home and receive a support from the home place while unmarried. * * *

"Third—On the death of my wife, I give, devise and bequeath all of my said property to my said son, Frederick, who shall within two years after the death of my wife pay to each of my said daughters if living, or their heirs if deceased, the one-sixth part of the value of my said estate at the time of the death of my wife. Provided that any sums that may be paid out of my said estate or the increase thereof during the lifetime of my wife, to any

of my said daughters, except such sums as are paid for the necessary support of any of them while unmarried, shall be considered as an advancement to the child receiving them, and shall be deducted from the share of such child in the division of my estate, but no interest shall be charged thereon and I direct that the several shares payable as aforesaid to my said daughters by my son, Frederick, shall be and remain a charge upon all the real estate of which I may die seized until the same are fully paid."

The widow was paid on her award, to support herself and children, $1496.48. The complainants contend that this sum, together with approximately $1000 in personal property remaining in the estate, was used up in farming the 210-acre farm given the widow for life. On this farm Frederick, according to the directions in his father's will, worked for approximately thirty-two years, sometimes receiving therefor, by agreement with his mother, the sum of $200 per year to support himself and family. After Frederick married, the widow continued to live on the farm and purchased out of the earnings from the farm an adjoining twenty acres, upon which, after Frederick married, there was constructed a small house, in which Frederick and his family lived for about twenty-five years. After Frederick's death, in 1910, the widow continued to live on and farm the 210-acre tract until four or five years before her death. During her fifty-year tenure as life tenant the land was worked steadily to its full capacity. During the last ten years of her life she made no improvements on the farm, and the evidence shows that the farm buildings and fences had been permitted to deteriorate in the extraction of the maximum net income for the widow as life tenant. For several years prior to her death the widow was alternately cared for by her daughter-in-law, Josephine Goetten, by her daughter Lena and by the three complainants. With considerable regularity the widow paid sums varying from $20 to $50 to the particular daughter or family with whom

she was staying after she ceased to live on the farm, to compensate them for their care and attention in her behalf. Lena testified that her mother paid $20 a month regularly for board and care received in the complainants' homes. One of the complainants admitted receiving $10 to $15 "once in awhile" to cover board. There was never any understanding between the widow and any of her daughters that they should be paid anything for taking care of her.

Lena in 1888, at the time of her first marriage, had received $1000 out of money then due Frederick from the widow as wages. This sum admittedly was to be deducted from her distributive share in her father's estate. About two years before her death Casper's widow gave $3000 to each of the complainants, Josephine Heitzig, Minnie Vahle and Mary Poggenpohl. According to the complainants their mother then stated that she owed them for taking care of her and that they would have to take care of her as long as she lived. The evidence shows that she was then in an enfeebled condition and suffering from a cancer. She had previously paid them monthly for her care and keep, and there is no proof that she then owed them anything for past services rendered. From the record it does not appear the daughters regarded this money as payment for services, either past or future. Thus, Mary Poggenpohl testified: "I did not treat my mother any differently when she was sick than I would if she had had no money. I did everything in the world for her." Josephine, daughter of Mrs. Poggenpohl, testified: "What my mother did was what any daughter would have done for her mother. * * * I never heard my mother tell my grandmother that she was going to charge for nursing her. She made no charge. * * * My mother did more work than the other girls in taking care of her." Nellie, daughter of Josephine Heitzig, testified: "My mother and grandmother did not have any contract or arrangement as to what grandmother was to pay for nursing and for board and washing. I don't

know that my mother was making any charge for those services. Just waiting on her as a dutiful daughter would do for her mother, and we [the children] were doing the same."

The evidence is undisputed that the $9000 divided by the widow among the complainants, and also the $1000 paid to Lena Schmidt, was money received by her as income from the farm. Excepting a small sum received from a half-brother's estate the farm was her only source of income. Minnie testified that her mother received $1400 in money from her half-brother, Joe Berger, when he died, about 1912. Josephine said she understood the sum was $1200 but did not know anything about it. Mary testified that about $1400 was received by her mother from her half-brother's estate and was spent to take care of and to pay the funeral expenses and buy a gravestone for the half-brother. Lena testified that $1000 was all her mother received from her half-brother, and that the $500 remaining after the funeral bills had been paid was given to the Catholic church. Outside of this small sum of money the evidence fails to show any other source of income to the widow than the farm from which the $9000 paid to the three daughters could have been derived. The chancellor found that the real estate of Casper Goetten was all that remained of his estate on his widow's death and fixed the value thereof at that time at $14,700.

The decree of the court below, in sustaining all of the substantial allegations made in the complainants' bill, held that under the will of Casper Goetten, Frederick took a vested remainder in fee in his father's estate, subject to the life estate in his mother; that their mother, as life tenant, became the sole owner of the income from rents, issues and profits from Casper's estate and that the same were never a part of the estate; that by virtue of the direction to pay, contained in the third clause of Casper's will, each daughter received at his death a vested interest in one-sixth

of the value of his estate, evaluated as at the death of his widow; that the three daughters were not accountable for sums paid them by the widow out of the increase of Casper's estate, for the reason that the increase was the widow's own separate estate, to do with as she liked; that on the death of their sister Christina her share descended by operation of law to her then heirs, and by that process Casper's widow received a two-sevenths interest and Frederick and each surviving sister received a one-seventh interest therein; that the widow's two-sevenths interest in Christina's share passed under the will of the widow to the complainants in equal parts. The court further held that the complainants need not account for sums received from the widow, awarded the complainants five per cent interest from the date of the decree, on the sums thereby found payable, and directed that if said sums were not paid within thirty days from the date of the decree the real estate should be sold to pay the same, and that any sums remaining after paying the same and costs of suit should be paid to Frederick's widow. It was also directed that the $1000 paid Lena Schmidt out of money due Frederick should be deducted from her share.

In behalf of the defendants below it is contended by the plaintiff in error that although the income from rents, issues and profits of Casper's estate during the widow's life were her separate property, to do with as she liked, the same were "the increase" of the estate of Casper within the meaning of the third clause of his will; that Casper could, and did, require by his will that the sums paid by the widow to a married daughter out of such increase should "be considered as an advancement to the child receiving" the same from his estate for the purpose of determining the extent to which any such child and his other children should participate in his estate, and that each of the complainants should for that purpose account for the $3000 or other sums paid each of them by the widow from

such increase as though such sums had in fact been advanced from Casper's estate. We believe that plaintiff in error's position is well taken. It is definitely and clearly supported by the language of the third clause of the will. The intention of the testator, when clearly expressed, must be given effect in preference to any surmise that he did not mean what he said or intended what he said to mean something else. (*Foss* v. *State Bank and Trust Co.* 343 Ill. 94; *McCormick* v. *Hall*, 337 id. 232; *Ryan* v. *Beshk*, 339 id. 45.) No other sentence or clause in the will contradicts the plain directions of the third clause, nor is any other language used which even casts a doubt upon its meaning. Certainly that portion of the will must have been inserted by the testator for some purpose he had in mind, and it therefore cannot be arbitrarily rejected as meaningless or surplusage. (*Levings* v. *Wood*, 339 Ill. 11; *Hollenbaugh* v. *Smith*, 296 id. 558; *Miller* v. *Wick*, 311 id. 269.) Where one construction of a will renders a portion of it meaningless and another gives effect to all the words used the latter should be adopted. (*Walker* v. *Walker*, 283 Ill. 11.) A fundamental and familiar rule in construing wills is to ascertain the intention of the testator from a consideration of the whole will, and such intention must be given effect if not in conflict with an established rule of law or of public policy. The intention sought is not what by inference may be presumed to have been in the mind of the testator but that which he expressed by the words of his will. (*Hollenbaugh* v. *Smith, supra.*) The whole scope of the will must be considered and every provision given due weight to ascertain the plan of the testator in the light of the facts and circumstances surrounding him, his family and property at the time the will was made. *Sartain* v. *Davis*, 323 Ill. 269.

When, with these fundamental principles in mind, we give due weight to every provision in the will of Casper Goetten, it is evident that his principal purpose, clearly ex-

pressed, was to effect an equitable division of his property among his six children. To this end, by the third clause of his will he directed that within two years after the death of his wife, his son, Frederick, to whom he had devised the property, should "pay to each of my said daughters if living, or their heirs if deceased, the one-sixth part of the value of my estate at the time of the death of my wife." By this direction to pay, the testator gave no vested interest in a one-sixth part of his estate with possession merely postponed until a future time. Casper required Frederick to pay any particular daughter only if such daughter were living at the time set for payment. If any daughter were not living at time for payment, Frederick was to pay other persons, in the alternative or by way of substitution, a share equivalent to that which the daughter would have been entitled to receive had she lived. The gifts to the daughters were expressly contingent upon their surviving until the time for distribution. Until that time it was wholly uncertain whether or not any one of them was to take under Casper's will.

Gray, in his Rule Against Perpetuities, (sec. 108,) lays down the following clear test for distinguishing between a vested and a contingent remainder: "Whether a remainder is vested or contingent depends upon the language employed. If the conditional element is incorporated into the description of or the gift to the remainderman then the remainder is contingent, but if, after words giving a vested interest, a clause is added divesting it the remainder is vested." (*Brechbeller* v. *Wilson*, 228 Ill. 502.) In *Haward* v. *Peavey*, 128 Ill. 430, the devise was to such of four persons as should be alive at the termination of the particular estate. Until that time arrived it could not be told who were to be the beneficiaries of the devise. There this court said: "Until that time the persons to take were not and could not be identified, and until that time it was wholly uncertain whether Robert Haward was one of them or not.

It follows that at the time the land in question was sold under execution Robert Haward's interest was only a contingent remainder, which was not subject to levy and sale, and that no title therefore passed to the purchaser by the marshal's deed." A remainder is vested where there is a right of present enjoyment or a fixed right to a future enjoyment in a determinate person after the particular estate terminates. If there is uncertainty either as to the person who is to receive or in the gift itself to the remainderman the remainder is contingent. (*Northern Trust Co. v. Wheaton,* 249 Ill. 606.) In *Starr* v. *Willoughby,* 218 Ill. 485, the will provided that as soon as practicable after the testator's decease all of the real estate not specifically devised should be sold, and the proceeds, after purchasing a home for the widow, divided among such children "as may be living at that time," and it was held the words quoted referred to the time of distribution and not to the time of the death of the testator, and that the children of the testator took no vested interest in that portion of the estate before the time of distribution which they could dispose of by will.

The heirs of Christina took as purchasers—not by descent. The testator's direction that Frederick should pay daughter Christina "if living, or her heirs if deceased," required that the alternative payment be made to her heirs as a class, since Christina died before time for distribution. In *Ebey* v. *Adams,* 135 Ill. 80, this court held that the words "or her heirs" in a similar testamentary clause were words of purchase and intended to operate as an alternative gift or a gift over to those persons who stood in the relation of heirs when the period for distribution arrived. When the widow died the life estate then terminated, and she was not, therefore, among those standing in the relation of "heirs" to her daughter Christina at the time for distribution. The gift was in the alternative—*i. e.,* either to each daughter, or to her heirs as a class if the daughter

was dead. The widow could not be included as one of such class of heirs for the obvious reason that such class was not determined at the time of the death of the testator but depended upon those who were living at the time set for distribution—the death of the widow. (*Blackstone* v. *Althouse,* 278 Ill. 481; *Bates* v. *Gillett,* 132 id. 287.) To hold that the word "heirs" of the deceased daughter, Christina, was intended to include the testator's widow, whose death had to occur before the gift became effective, would destroy the obvious intent of the testator and render the will absurd. Such a construction is never adopted where it can be obviated. *Johnson* v. *Askey,* 190 Ill. 58.

In *Walker* v. *Walker, supra,* this court construed a will which provided that five years after the testator's death the trustees should divide all the testator's remaining estate into six equal portions, and pay one such portion to his daughter Catherine "if she be living, and if she be not, then to her heirs-at-law," the undistributed balance to be similarly divided at the end of ten years. The question arose whether the interests of Catherine and others taking under this clause were vested or contingent. This court said: "Considering all of the provisions of the will in the light of the circumstances under which it was made and the condition of the family and of the property of the testator at that time, we think the wording of the will shows that the testator intended that the legacy should not vest until the respective five and ten-year periods of distribution had arrived. * * * This being so, the decree of the circuit court holding that these interests were contingent and not vested was correct." In the case before us there was no independent or original gift but solely a direction to pay within two years to each daughter if living, or to her heirs if deceased, an amount to be determined upon the widow's death. The intention of the testator was to give his wife only a life estate in his property. There is no intention indicated by any words of his will to also bestow

upon his wife such additional shares as she might inherit as an heir of her children who pre-deceased her. On the contrary, the testator clearly expressed an intention to divide his estate, after his wife's death, into six equal shares, so that each child would take a one-sixth part. It is therefore evident that the court erred in finding that the contingent share of the daughter Christina passed by descent to her heirs at her death, and that the widow took, as one of Christina's heirs, a two-sevenths interest in a one-sixth part of the estate, which passed by her will to the complainants.

The remaining question concerns the payment by the widow of $3000 to each of her three daughters. Its determination does not rest upon a construction of the will but depends, rather, upon the application of the express and unquestioned directions of the testator to the facts in evidence. By the third clause of his will the testator provided that "any sums that may be paid out of my said estate or the increase thereof during the lifetime of my wife, to any of my said daughters, * * * shall be considered as an advancement to the child receiving them, and shall be deducted from the share of such child in the division of my estate." Under the rules of construction above mentioned these directions cannot be ignored or rejected. This being true, can the rents received and accumulated by the widow during her fifty-year life tenancy of the farm be properly considered an "increase" of the testator's estate within the meaning of this clause? By Webster's International Dictionary, "increase" is defined as "enlargement, growth, development, increment, addition, accession, extension, production, profit, interest, issue, offspring." When the testator directed that all sums paid out "of my estate or the increase thereof" should be considered as advancements, the increase referred to was clearly the net proceeds in money received and accumulated by the widow from rents, issues and profits of the farm. The testator left

little property other than the farm to the widow, and the proof clearly shows that practically her entire income consisted of money received and accumulated from the farm.

The testator manifested a clear intention that his estate, upon the death of his widow and when Frederick within two years thereafter was ready to pay, should be divided in such manner that a daughter who had been paid money from his estate or the increase thereof in the widow's lifetime, should receive, including that sum, exactly the same as any other child. This could only be done by treating sums paid by the mother as though they had been, in fact, advancements from the *corpus* of the estate. The desire for equality among his children which would result from following the express language of Casper's will is found in every part of the instrument. It is upon the idea of equality that the doctrine of advancements is founded. (18 Corpus Juris, p. 912.) The words "shall be considered as an advancement," in the will in question, mean, that whatever any daughter was paid from the estate, or the increase thereof, during the lifetime of the mother, should be brought into the estate at the time of the distribution by Frederick for the purpose of determining the division and distribution then to be made. In other words, the amounts received by the daughters during the lifetime of their mother from the estate, or the increase thereof, were to be added to the value of the estate at the date of the death of the mother to make the true basis for distribution or division and the amount received by any daughter was to be deducted from her share of the total. The $1000 paid to Lena by the widow and deducted from her share by the court's decree was, except in point of time when paid, of the same character and entitled to no different treatment than the $3000 afterwards paid by the widow to each of her three other living daughters. This $1000, as well as the $9000 afterwards distributed, was all necessarily derived by the widow from the estate of Casper Goetten,

"or the increase thereof," as she is shown to have had no other property of any consequence. While the will placed no other restrictions upon the widow's use and enjoyment of her life estate or its increase, it did specifically provide in plain language that if any of the daughters received any portion of it during their lifetime they were to account for what they received in their settlement with Frederick. Any other construction would do violence to the clearly expressed intention of the testator and amount to an utter disregard of the language used by him in the third clause of his will. The trial court therefore erred in dismissing the cross-bill and in holding that the three complainants were not required to account to Josephine C. Goetten for the $3000 paid to each of them by their mother.

The decree is therefore reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*