827 N.E.2d 6 (2005)
356 Ill. App.3d 607
292 Ill.Dec. 859
In re ESTATE OF John S. GOODKIND, Deceased (American Cancer Society, a New York Not-for-Profit corporation, and William D. Goodkind, an Individual, Petitioners-Appellants,
v.
John Goodkind, and Eduard Glavinskas, as *7 Guardian Ad Litem for Phoenix Harvey, f/k/a Phoenix Goodkind, a Minor, and William D. Goodkind, as Independent Executor of the Estate of John S. Goodkind, Deceased, Respondents-Appellees).
No. 1-04-1619.
Appellate Court of Illinois, First District, First Division.
March 14, 2005.
*8 James Geis, James Geis Law Office, Chicago, for Appellant.
Eduard Adam Glavinskas, Porikos, Rodes, Economos & Glavinskas, Chicago, for Appellee.
Justice GORDON delivered the opinion of the court:
This case returns to this court on appeal from a hearing to construct the will of John Goodkind (John) which we mandated in our decision in In re Estate of Goodkind, No. 1-02-1079 (2003) (unpublished order under Supreme Court Rule 23) (Goodkind I). On appeal, appellants, William Goodkind (William) and the American Cancer Society (ACS), contend that the probate court erred by failing to construe the language of the will of decedent, John Goodkind, as disposing of his entire estate, which would preclude any portion of the estate from passing via intestacy to John's illegitimate daughter, Phoenix Harvey (Phoenix), and his son, John Edward Goodkind (John Edward).[1] We reverse.

I. FACTUAL BACKGROUND
John died shortly after being released from the Cook County jail to receive cancer treatment. He had previously been *9 charged with predatory criminal sexual assault of a child, namely, Phoenix.
After being charged, John initially fled Illinois, while released on bond awaiting trial, and hid out with his brother, Richard, in Nebraska, where he was ultimately apprehended by police. Before John was extradited to Illinois, Richard died, leaving his entire estate to John; this estate included real estate in Hawaii, a record collection, furniture, and $184,790 in bank deposits, money market accounts and stocks. John possessed nothing other than his inheritance from Richard. Upon being returned to Illinois, and incarcerated in the Cook County jail, John was diagnosed with cancer and sought to prepare his last will and testament. John's criminal defense attorney, who was also a clinical law professor, agreed to draft a will for him.
This will, executed on August 25, 1998, provided, in pertinent part:
"I, JOHN S. GOODKIND, a resident of Chicago, Illinois, being of sound mind, do make, publish and declare this to be my Last Will and Testament, and I revoke all prior wills and codicils.
I.
I give all of my personal effects, household goods, automobiles, and all other goods and chattels to my brother, William Goodkind, Sr. * * * and my sister, Karen Stempinski * * *, if they survive me, in shares of substantially equal value. If my brother and my sister do not survive me, I give such articles to Sandra Goodkind.[2]
II.
I give the residue of my estate, to my brother and my sister, if they survive me, otherwise to Sandra Goodkind. If none of those three individuals survives me, I give the residue to the American Cancer Society."
John subsequently executed a second will on March 26, 1999, prepared by the same attorney. That will provided:
"I, JOHN S. GOODKIND, a resident of Chicago, Illinois, being of sound mind, do make, publish and declare this to be my Last Will and Testament, and I revoke all prior wills and codicils.
I.
I give all of my personal effects, household goods, automobiles, and all other goods and chattels to my brother, WILLIAM GOODKIND, SR. * * * and the American Cancer Society to be divided, in equity, in substantially equal shares in value as my brother shall determine.
III.
I name my brother as the executor of this Will. * * *"
Thus, this will removed John's sister, Karen, and Sandra Goodkind as legatees and deleted the entire paragraph which purported to give the entire residue of his estate to them. John also, in the second will, reiterated the powers of the executor provided in the first will.
John died on August 7, 1999. John's parental rights for Phoenix had previously been terminated on February 1, 1999. At the time of John's death, Phoenix was in the process of being adopted by an unrelated, Peoria-area couple.
After John's death, William, as the executor appointed under the second will, petitioned for construction of the will. William sought for the will to be interpreted so as to allow the entire estate to be *10 divided between himself and ACS. William's petition primarily claimed that the term "personal effects," used in the first clause, was ambiguous, potentially encompassing the intangible as well as the tangible assets. The probate court denied the petition to construe the will, however, as well as William and ACS' motion to reconsider. William and ACS appealed.
In that appeal, Goodkind I, we determined, based on extrinsic evidence presented by William, that the term "personal effects" was latently ambiguous, meaning that it was possible that "John may very well have intended to use that term in a broader sense to include a devise of his entire estate, rather than to employ the term's plain and ordinary meaning of tangible personal property only." Goodkind I, slip op. at 16. We determined that a construction of "personal effects" as encompassing the entire estate would be legally viable as "we agree[d] with William and ACS that Linn [v. Davis, 223 Ill.App. 503 (1922),] does stand for the proposition that a broader interpretation of the term `personal effects' is at least possible in a context where other factors are involved which tend to support a conclusion that the testator's intent in using the term was to, in fact, mean his entire estate. [Citation.]" Goodkind I, slip op. at 13. We held that the "latent ambiguity create[d] the need for interpretation of John's will, and [that] a hearing must be held" to determine if John intended such a broader meaning. Goodkind I, slip op. at 16.
On remand, the circuit court allowed discovery, during which William and the attorney who drafted the will appeared for discovery depositions. At the close of discovery the circuit court considered and denied cross-motions for summary judgment. The court then held a will construction hearing at which William and the drafting attorney testified.
The drafting attorney's hearing testimony revealed that John's wills were the only two he had ever been involved in drafting. He admitted that he never discussed with John what assets were actually in his estate. The attorney explained that the actual will preparation was done by his students and that his guidance to his students in that regard consisted merely of telling them to follow the form used in a recent Illinois Institute for Continuing Legal Education (CLE) booklet. When asked by Phoenix's counsel whether the "personal effects" clause disposed of real property, or whether a residuary clause was necessary, the attorney answered that he did not know. The attorney further testified:
"I told the student to put everything that everyone was going to get into the first paragraph, that I thought that that was going to take care of everything. So I just told her to changethe main change was just simply from the sister to the Cancer society. I told her to effect that and that it would be done in the very first opening paragraph."
The attorney could not recall whether he reviewed the student's performance of the revisions before taking the second will to John to sign. The attorney testified that John had clearly and unequivocally instructed him to revise the first will to pass all of his estate to William and ACS and that he thought the second will accomplished that purpose. In fact, the attorney counseled John that the second will accomplished his intentions. In response to Phoenix's counsel's question, inquiring if he had ever explained the provisions of the second will to John, the attorney stated:
"Yes, I would have. `Here's the will you wanted us to sign. I know that you wanted half to go to Bill, and half to go to the American Cancer Society. This is what the will does. You have to sign it and then Margaret and I will be the *11 witnesses.' So I would have done that with him, yes."
William likewise testified that John had requested that he see to it that John's attorney revise the first will to pass all of his estate to him and ACS. William further testified that he had attempted to sell the record collection, but was told it was worthless.
At the conclusion of the evidence, William and ACS argued that it would be absurd to interpret the will as providing for the disposition of worthless personal property while leaving valuable intangible assets to pass via intestacy. They also reminded the circuit court of the rule of will construction under which there is a presumption against intestacy. For her part, Phoenix argued that the will was unambiguous and that to construe the clause disposing of "personal effects" as encompassing anything other than tangible goods would be to rewrite the will.
After hearing the evidence and arguments, the circuit court stated:
"The facts of the case are that Mr. Goodkind, the testator, did not, as it has been represented to the Court in the hearing, have anything that would qualify, really as substantial personal effects, household goods, automobiles, and other goods and chattels.
* * *
Under [the] construction as I found it be [under its original order denying the petition to construe the will], he [William] would be legatee of one half of not a whole lot.
* * *
* * * [I]t is quite apparent to me that John's intention after the first will was written * * * was that he did want to write a new will * * * that would pass his entire estate to his brother, William, and to the American Cancer Society. * * * Otherwise, this whole thing doesn't make a lot of sense.
* * *
Writing the will as it stands now makes no sense unless John  there's no reason do what was done if John didn't intend to pass the whole estate.
* * *
So, again, all of the evidence comes through John's desire to write a will, a new will, or something, that he would distribute his entire estate.
* * *
Clearly, he intended to give away his whole estate, but I don't see that he did that. To me, I would be rewriting the will, yes, to make it the way he wanted it to be. But as I understand the rules on construction, I'm not allowed to do that.
* * *
He intended to convey the whole estate. That's what he wanted to do. But if the language doesn't do it, if the attorney didn't do it, and what appears to me, and just as[the drafting attorney] even said it, there was a mistake made.
* * *
Now, as I say, as I understand the laws on construction, we're not supposed to rewrite the will to make it the way that the person wanted it to be. We're to look at the will and say, what does this will say, and not add the missing clauses."
The circuit court therefore ruled against William and ACS, finding that the will only passed John's physical, tangible possessions to them, whereas everything else *12 would pass via intestacy. William and ACS again appeal.

II. ANALYSIS
On appeal, William and ACS first claim that the circuit court erred by ignoring our instructions to it from Goodkind I. They contend that, although we identified a latent ambiguity in the will and mandated that the circuit court ascertain John's testamentary intent to resolve the ambiguity, the circuit court reached the conclusion that the will was unambiguous on its face and therefore actually refused to construe the will by failing to consider whether John actually intended his testamentary language to pass his entire estate or only his tangible personal property. We agree.
As the circuit court acknowledged, we previously found a latent ambiguity in the term "personal effects" as used in John's will. Goodkind I, slip op. at 16. "A latent ambiguity occurs when the will appears clear on its face but some fact external to the will reveals that a description of a bequest or of a legatee in the will is inadequate to determine who or what was intended by the testator." Coussee v. Estate of Efston, 262 Ill.App.3d 419, 424, 199 Ill.Dec. 19, 633 N.E.2d 815, 818 (1994); see also Doblin v. Allison, 92 Ill.App.3d 942, 944, 48 Ill.Dec. 368, 416 N.E.2d 399, 401 (1981) ("a latent ambiguity [exists] where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates the necessity for interpretation or choice among two or more possible meanings" (emphasis added)). We likewise determined that "personal effects" was susceptible to a construction that could encompass the testator's entire personal estate. As we pointed out in Goodkind I, this interpretation was upheld in the earlier appellate decision of Linn v. Davis, 223 Ill.App. 503 (1922), which we stated stood "for the proposition that a broader interpretation of the term `personal effects' is at least possible in a context where other factors are involved which tend to support a conclusion that the testator's intent in using the term was to, in fact, mean his entire estate. [Citation.]" Goodkind I, slip op. at 13. The holding of Linn was extensively discussed and analyzed in Goodkind I and therefore need not be reiterated here. Our findings of latent ambiguity and the possibility of different meanings of "personal effects" in Goodkind I constituted the law of the case and were therefore binding on the circuit court on remand. See Zokoych v. Spalding, 84 Ill.App.3d 661, 666, 40 Ill.Dec. 128, 405 N.E.2d 1220, 1225 (1980) ("where the appellate court reverses a judgment, its findings are final upon all questions decided").
Reviewing the record in this case, we conclude that the circuit court may well have misunderstood our holding in Goodkind I. When the circuit court stated, "[C]learly, he intended to give away his whole estate, but I don't see that he did that. To me, I would be rewriting the will," it sought to avoid a construction that would depart from the ordinary meaning of the words deployed in the will and was reluctant to consider extrinsic evidence mandating a less obvious meaning of those words that would nevertheless better reflect the intent of the testator. The attempt to avoid that construction, however, is not consonant with our finding in Goodkind I and with the principles of interpretation applicable to latent ambiguity.
When an ambiguity is found in its terms, construction of a will is required. Coussee, 262 Ill.App.3d at 424, 199 Ill.Dec. 19, 633 N.E.2d at 819 ("If a court finds that a will is ambiguous * * * the action for construction continues * * * "). "The purpose of construction is to give the will *13 the meaning and interpretation which the testator intended it should have * * *." Liesman v. Liesman, 331 Ill. 287, 291, 162 N.E. 855, 857 (1928); see also Storkan v. Ziska, 406 Ill. 259, 264, 94 N.E.2d 185, 188 (1950), quoting Armstrong v. Barber, 239 Ill. 389, 398, 88 N.E. 246, 249 (1909) ("`The paramount rule in the exposition of wills, to which all others must bend, is, that the intention of the testator as expressed in the will must be ascertained and given effect * * *'"); Andrews v. Applegate, 223 Ill. 535, 538, 79 N.E. 176, 177 (1906) ("Words used in a will are to be given the meaning which the testator intended they should have * * *").
In construction proceedings a court may admit extrinsic evidence to understand "the circumstances by which the testator was surrounded" so as to understand the meaning of the terms actually used. Turek v. Mahoney, 407 Ill. 476, 480, 95 N.E.2d 330, 333 (1950); 4 W. Bowe and D. Parker, Page on Wills § 32.8, at 260 (4th ed.1961) ("the facts and circumstances existing at the time of the execution of the will * * * [are] admissible * * * to `enable the court to place itself in the testator's situation, to see things as he saw them, and to apply his language as he understood and intended it'"). As Phoenix contends, extrinsic evidence may not be used to contradict the clear import of the testator's words, to add terms and provisions, or to otherwise reform the will. See Doblin, 92 Ill.App.3d at 945, 48 Ill.Dec. 368, 416 N.E.2d at 401 ("courts are without power, under the guise of interpretation, to alter a testator's will or to make a new will for him"). Phoenix's proffered example, that a court may not accept any amount of extrinsic evidence to modify a devise which on its face reads "I give my entire estate to my son A" to actually pass the estate to "daughter B," amply demonstrates the principle. However, in closer cases, "context and circumstances" may justify a modified understanding of a term with an otherwise established, different ordinary meaning. Baker v. Forsuman, 15 Ill.2d 353, 360, 155 N.E.2d 24, 27-28 (1958) (holding the established meaning of "heirs" did not apply to the will at issue under the facts of the case); see also Dalton v. Eash, 411 Ill. 296, 300, 103 N.E.2d 483, 485 (1952) ("A technical construction of words or phrases will not be carried to the extent of defeating the obvious general intention of the testator, and this intention will be given effect even though the language may not be clear or technically correct"); Andrews, 223 Ill. at 537, 79 N.E. at 177 ("The words used by a testator are to be understood in their ordinary sense unless a different meaning is indicated by the context" (emphasis added)).
Thus, the ultimate "question for the Court [construing a will] is `not what the testator meant to say, but what he meant by what he did say'" (Doblin, 92 Ill.App.3d at 945, 48 Ill.Dec. 368, 416 N.E.2d at 401, quoting Hull v. Adams, 399 Ill. 347, 352, 77 N.E.2d 706, 710 (1948)), which necessarily requires a determination of whether the words used by the testator are capable of being expanded to embody the proffered testamentary intent (see In re Estate of Beisgen, 387 Pa. 425, 431, 128 A.2d 52, 55 (1956) ("The intention of testator * * * must be determined from what appears upon the face of the will. Extrinsic evidence of surrounding facts must only relate to the meaning of ambiguous word [sic] of the will. It cannot be received as evidence of testator's intention independent of the written words employed")).
Although "`personal effects' usually does refer to items worn on, carried by, or otherwise having an intimate relation to the person [citation], the term is not restricted to such a meaning." Landstrom v. Krettler, 105 Ill.App.3d 863, *14 865, 61 Ill.Dec. 660, 435 N.E.2d 149, 151 (1982); see also 80 Am.Jur.2d Wills § 1098, at 294 (2002) ("The term `personal effects,' without qualifying words, ordinarily embraces such tangible property as is worn or carried about the person, or tangible property having some intimate relation to the person; however, where the context so requires, the term may have a broader meaning"). Thus, when the testator's intent suggested a construction beyond the term's ordinary meaning, the Landstrom court construed "personal effects" as encompassing silverware. Landstrom, 105 Ill.App.3d at 865-66, 61 Ill.Dec. 660, 435 N.E.2d at 151-52. Similarly, while resolving a latent ambiguity in a contract, the Arkansas Supreme Court allowed for the broadening of the meaning of "personal effects" to include furniture. See Ellege v. Henderson, 142 Ark. 421, 425, 218 S.W. 831, 832 (1920). Particularly pertinent to this case, two courts have concluded that "personal effects," as used in wills, may incorporate bank accounts and other financial instruments. See Turner v. Estate of Fletcher, 252 Ark. 917, 919-20, 483 S.W.2d 176, 178 (1972) (describing "personal effects" as "an inclusive term"); Galloway v. Galloway, 32 App. D.C. 76 (1908). Finally, as we pointed out earlier here and in Goodkind I, the Illinois Appellate Court has previously held that "personal effects" may encompass an entire personal estate. Linn, 223 Ill.App. at 508. Consistent with the foregoing, the Pennsylvania Supreme Court has observed that, historically, the term bore that meaning. In re Estate of Beisgen, 387 Pa. at 433, 128 A.2d at 56 (while ultimately adopting a more restricted definition, noting that "`personal effects,' in the early Pennsylvania cases which followed the English cases, were given a broad meaninga meaning sufficiently broad to include all the testator's personal estate"); see also In re Estate of Reimer, 159 Pa. 212, 221-22, 28 A. 186, 188 (1893) ("What are his personal effects? Necessarily, everything embraced within the description `personal property.' This is the language of all the authorities in all cases where the natural meaning of the word `effects' is not restricted by the context * * *"). Thus, under this approach, the circumstances surrounding the drafting of John's will may be construed to suggest a broader intended meaning of "personal effects" without necessarily rewriting the will.
Accordingly, the circuit court erred when it apparently concluded that the term "personal effects" could encompass anything but the tangible personal property when extrinsic evidence clearly supported that the testator intended a much broader meaning. Such a conclusion is wholly contrary to our holding in Goodkind I. Significantly, the extrinsic evidence presented to the circuit court, including evidence taken after remand from Goodkind I, firmly demonstrated that John would have understood the actual language of his will as broadly disposing of his estate because his attorney told him it did just that. The drafting attorney testified to telling William "Here's the will you wanted us to sign. I know that you wanted half to go to Bill, and half to go to the American Cancer Society. This is what the will does."
Phoenix would appear to contend that reaching this conclusion would amount to our impermissibly reforming the will to correct the drafting attorney's mistake, relying on Engelthaler v. Engelthaler, 196 Ill. 230, 63 N.E. 669 (1902). We disagree.
In Engelthaler, an attorney drafted a father's will to leave his home to his wife on his death, but his wife subsequently predeceased him; on the father's death, his son sought for the will to be construed so that the home would pass exclusively to him, as opposed to having to share it with *15 other heirs under intestate succession. Engelthaler, 196 Ill. at 233, 63 N.E. at 670. The son argued that his father could not communicate well with his attorney due to his limited fluency in English, and that both his father and the attorney assumed that a clause had been written naming the son as an alternate legatee. Engelthaler, 196 Ill. at 233, 63 N.E. at 670. Our supreme court emphasized that what the appellant asked the court to do was to use parol evidence to reform the will by filling a "total blank" left in the will by the failure to provide for an alternate legatee in the event the initial legatee predeceased the testator. Engelthaler, 196 Ill. at 234-35, 63 N.E. at 670-71. The Engelthaler court observed that, while extrinsic evidence could be used to explain latent ambiguities, it could not do so in that case as the ambiguity was patent, appearing on the face of the will itself. Engelthaler, 196 Ill. at 234, 63 N.E. at 670. Thus, the facts of Engelthaler are wholly inapplicable to the case here, which involves a latent ambiguity in the will's language.
What is presented in this case is a situation where, although the drafting attorney inexplicably omitted standard terms from the will that would have unambiguously passed the entire estate, he included words that could reasonably have been understood by a layman, like John, to accomplish the passing of his personal estate, at least, and would have been so understood when, as happened here, the attorney represented that those words did, in fact, pass the whole estate. As the court in Marvin v. Peirce, 84 N.H. 455, 460, 152 A. 484, 488 (1930), noted:
"It may well be that the testator would have done better in expressing himself if he had not undertaken to do so in terms of legal phraseology naturally obscure to him but accepted because of reliance upon the lawyer's implied assurance that they expressed his wishes. A lawyer's mode and manner of expression and exactitude of meaning are not necessarily synonymous. When it is argued that if a certain result were intended, the testator would have declared it or provided for it in clear and simple language, it does not meet the issue."
We do not mean to suggest, again using Phoenix's proffered example, that had an attorney drafted "I give my entire estate to my son A," the testator could reasonably, based on his attorney's representations, understand the will to give his entire estate to "daughter B," since the term "my son A" is in no way susceptible to being interpreted as referring to "daughter B." However, as we already discussed, the term "personal effects" is susceptible to more than one meaning, including a meaning that would encompass the entire personal estate. See Linn, 223 Ill.App. at 508. We will therefore interpret the language of the will as the evidence establishes that John intended it, could reasonably have understood it, and as far as the language employed will allow: as dividing his entire personal estate between William and ACS.
This result is in harmony with the rule of will construction that a "construction is never adopted where it can be obviated" when that construction would "destroy the obvious intent of the testator and render the will absurd." Heitzig v. Goetten, 347 Ill. 619, 629, 180 N.E. 428, 432 (1932). As the circuit court stated, William and ACS would each have received one-half of "not a whole lot," and the drafting of the second will would not make sense if they were limited under the will to receiving John's tangible personal property. In fact, from our reading of the record, it would appear that a devise limited to John's tangible personal property would amount only to the bequeath of the burden of disposing of those items. It would also *16 seem quite peculiar for an individual to leave tangible personal items, excluding items which could be auctioned off for considerable sums, such as Stradivarius violins or Van Gogh paintings, to a charitable organization such as ACS. Further, John never otherwise appears to have envisioned Phoenix as an object of his bounty, as she was excluded from the first will which unambiguously passed his entire estate. Finally, it would seem strange for John to have intended to pass property to Phoenix via intestacy when her ultimate status as an heir was in doubt. Phoenix's adoptive parents had taken custody of her, prior to John's death, on June 5, 1999. As the circuit court noted, had Phoenix's formal adoption been completed prior to John's death, she would have ceased to be an heir. See 755 ILCS 5/2-4(d) (West 1998) ("For purposes of inheritance from or through a natural parent and for determining the property rights of any person under any instrument, an adopted child is not a child of a natural parent, nor is the child a descendant of a natural parent or of any lineal or collateral kindred of a natural parent * * *").
However, we do agree with Phoenix that, although John's general intent may have been to pass his entire estate, we cannot honor that intent to the extent of expanding the meaning of "personal effects" to encompass real estate. As we have pointed out earlier, latent ambiguity is not established unless it is possible to interpret the language actually deployed in the will to be in alignment with the intent established by extrinsic evidence. In re Estate of Beisgen, 387 Pa. at 431, 128 A.2d at 55 ("The intention of testator * * * must be determined from what appears upon the face of the will. Extrinsic evidence of surrounding facts must only relate to the meaning of ambiguous word [sic] of the will. It cannot be received as evidence of testator's intention independent of the written words employed"). While "the term `real estate' in a will is not necessarily required in order to make disposition of that species of property," real estate will only pass testate if "any other term or language" is "broad enough to include real estate." Wickizer v. Whitney, 364 Ill. 125, 129, 4 N.E.2d 46, 48 (1936) (holding the term "property" to be broad enough to encompass realty). Thus, the related term "personal estate" has been held to include real property when associated in a will with other terms typically addressing realty such as "devise and bequeath," and when the executor was given powers to mortgage, rent and repair the "personal estate," which are powers typically associated with land. Caracci v. Lillard, 7 Ill.2d 382, 387, 130 N.E.2d 514, 516 (1955). However, unlike in Caracci, we observe no similar associations linking "personal effects" to realty. William and ACS point out that the Andrews court held that "effects" could encompass real estate. Andrews, 223 Ill. at 538, 79 N.E. at 177. However, William and ACS point out no precedents holding that "personal effects" may be so construed, and, in fact, our own research only reveals a case holding to the contrary. See In re Estate of Townsend, 221 Cal.App.2d 25, 27, 34 Cal.Rptr. 275, 277 (1963) ("The residuary terms, `all of the balance of ... personal effects' used in paragraph six of the will cannot be construed to apply to the balance of the estate which also included real property").
For all the foregoing reasons, we reverse the judgment of the circuit court. We remand for the entry of an order granting the petition to construe the will and mandating the division of John's entire personal estate, including the bank accounts and stocks, between William and ACS "in substantially equal shares in value as [William] shall determine" in accord with our construction of John's will, but *17 also providing for the funds from the sale of the Hawaii real estate to pass to the rightful heirs via intestacy.
Reversed and remanded with instructions.
CAHILL, P.J., and McBRIDE, J., concur.
NOTES
[1] Phoenix is represented in this appeal through a guardian ad litem. John Edward, who was an inmate of the Illinois Department of Corrections at the time of his father's death and throughout the probate court proceedings, has made no appearance, though given notice.
[2] Sandra Goodkind is John's ex-wife.